## HUASTECA PETROLEUM CO. et al. v. 27,907 BAGS OF COFFEE et al.

### SAME v. DAVID G. EVANS COFFEE CO. et al.

District Court, S. D. New York.
April 15, 1932.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and P. Fearson Shortridge, both of New York City, of counsel), for libelants.

Bigham, Englar, Jones & Houston, of New York City (Henry N. Longley, Leonard J. Matteson, and Richard F. Shaw, of New York City, of counsel), for claimants-respondents.

FRANK J. COLEMAN, District Judge.

The only question presented is as to the amount which should be fixed as the salvage award for the entire operation. There is no issue raised as to its apportionment between the two libelants, nor as to whether the award should be in rem against the coffee or in personam against the cargo owners. The libels of the Merritt, Chapman & Scott Corporation will be dismissed without costs because anything which should be allowed for its services will be included in the awards to the Huasteca Petroleum Company.

On September 15, 1923, the steamer Pe-

lotas bound from South America to New Orleans stranded on a reef two or three miles outside the harbor of Vera Cruz, where she remained until released on October 6th by the two salvage vessels St. Heliers and the Warbler. In order to effect her release it was necessary to remove her cargo, which was done largely by means of lighters towed to and from Vera Cruz by the St. Heliers. The latter commenced its salvage operations on September 23d under a no-cure-no-pay contract and immediately laid beach gear to prevent the Pelotas from going further upon the reef. On the following day, September 24th, she commenced towing the lighters from Vera Cruz and back with the 28,000 bags of coffee, which constituted practically all the valuable cargo that was still on board the Pelotas when the St. Heliers arrived. This unloading continued until October 6th when the vessel was floated, at which time she had practically no cargo left.

The coffee salvaged by the St. Heliers was stored in Vera Cruz until November 20th when it was shipped to New Orleans on another vessel and ultimately delivered to the consignees. The transportation to New Orleans was procured by the cargo owners, and the salvors rendered no service after the coffee left the storehouse in Vera Cruz.

█ The first consideration to be determined is whether the Warbler rendered any service to the coffee. She arrived at the scene of the stranding on September 28th and did not commence any operations until the 29th. She never towed any of the lighters nor assisted directly in the unloading of the coffee. She did put out additional beach gear from the Pelotas and installed certain pumps. When she commenced her operations there were about 8,000 bags of coffee still on board which had not been completely ruined, and any award for the services must, of course, be confined to them because they were the only portion of the cargo possibly benefited by the Warbler. The question presented is whether this coffee was rendered more secure by the work which the Warbler did. It was removed probably at a decreasing rate during the eight days that the Warbler was acting, so that it is fair to say that most of it was removed within two or three days after the Warbler's arrival and that this was the least damaged part of the 8,000 bags.

The only ways in which it could be claimed that the Warbler rendered assistance to the 8,000 bags was (1) in making the hull more secure while they were on board, and (2) by lowering the water level in the holds.

As to the first, it appears that the Pelotas was resting solidly on the bottom, but was in some slight danger of being broken up in case a northerly storm drove her further on the reef. To avoid this the St. Heliers had put out heavy beach gear. The additional beach gear put out by the Warbler did not add much to the safety of the vessel, but still less to that of the remaining cargo. A reading of the testimony convinces me that if this additional beach gear was any advantage to the remaining cargo it was very slight because the danger of a breakup before the unloading could be completed was very small. The beach gear laid by the St. Heliers was probably adequate especially in view of the fact that the real season for northerly storms had not yet commenced.

As to the lowering of the water in the holds it appears that before the Warbler arrived the water was at sea level and that all the direct wetting of the coffee had already occurred. It is possible that lowering the level to some slight extent prevented indirect wetting by seepage and capillary attraction. In this connection it should be borne in mind that the portion of the 8,000 bags which was most badly damaged probably was the portion nearest to the water level so that the slight additional indirect wetting which may have been prevented would not have been of much account.

It is plain that the Warbler's operations were primarily for the benefit of the hull and would not have been warranted for the purpose of rendering the coffee more secure. They would never have been undertaken for the coffee, and whatever assistance they may have been to the hull, their slight benefit to the cargo was entirely incidental. It would probably be fair for the 8,000 bags to contribute something, but not in proportion to the respective values of the coffee and of the hull. The value of the 8,000 bags is difficult to determine, and it was undoubtedly less than that of the average of all the coffee saved. Under all the circumstances it seems to me that the 8,000 bags should contribute to those expenses of the Warbler jointly chargeable against cargo and hull to the extent of one-fifth of the ratio between value of the 8,000 bags at the average for the entire cargo saved, and the value of the hull.

█ The value of the St. Heliers I find to have been approximately $115,000 and that no deduction should be made on the ground that an ordinary tug would have served the purpose. She not only towed the lighters, but before commencing the unloading laid the

beach gear, which I believe contributed to the safety of the cargo during the discharge.

The value of the Warbler was approximately $230,000, but since it rendered so little service to the cargo it is not practical to consider it in determining the bounty. The salved value of the Pelotas was $26,000, less certain expenses which may be determined on settlement of findings.

■ As to the value of the coffee salvaged by the St. Heliers, the ultimate question is: What was the value at the time and place where the coffee was surrendered to the representatives of the cargo owners? This occurred in Vera Cruz in November, 1923, where there was no market and consequently no market price. There is in evidence the market value of the coffee at New Orleans at the time of its arrival, and this less the cost of transportation would ordinarily be considered as the value at Vera Cruz. Respondents' contention that it should be reduced to allow for the danger of revolution, etc., does not seem to me sound because of its speculativeness. The testimony of Lee to support this reduction, while undoubtedly given in good faith, is too speculative to be the basis of a finding. On the other hand, the rising value at New Orleans after the arrival and before the final distribution seems to me irrelevant. The value is accordingly fixed at $343,000.

■ The expenses of the St. Heliers and of unloading, etc., which were incurred solely for the protection of the cargo, are, of course, chargeable against it in full. Those which were incurred for both cargo and the hull are chargeable against each in proportion to their respective values. This is, of course, exclusive of the expenses of the Warbler.

■ The claimants-respondents charge the salvors with negligence in not properly protecting the coffee after it was landed at Vera Cruz and before it was delivered to the owner's representative. It was placed by the salvors in an old warehouse where it sustained very considerable damage from rain and pilferage. Some of it was placed directly on wet ground and some upon wet dunnage which consisted of old railroad ties. Holes in the roof admitted rain which did further damage. A reading of the testimony, however, convinces me that the salvors took all the measures which could have been reasonably expected of them under all the circumstances of the port. During most of that period there was present the representative of the cargo underwriters, Mr. Lee, who was a man of experience and ability. He took an active part in the work and was unable to prevent the damage. I do not believe that there was any other warehouse available except at such distances in the interior as would have made it impracticable to store the coffee there. Apparently every reasonable measure was taken to repair the roof, procure dry dunnage, and otherwise protect the coffee. It was to the interest of the salvors as well as of the owners to have as much value saved as possible, and the testimony of those who were actually on the spot convinces me that they did all that was reasonable under the circumstances.

■ In determining the amount of the bounty, it seems to me that while the St. Heliers and the other property used in salvaging the cargo were not subjected to much danger, considerable skill and experience were required in the operations which occupied thirteen days from September 23d to October 6th exclusive of the six weeks thereafter when the coffee had to be protected in the warehouse before it was turned over to the owner's representatives. The work was diligently and, under all the circumstances, promptly performed. The St. Heliers was specially equipped for salvage in the Gulf of Mexico and had to make a special trip from Tampico for this work. The salvors financed the operations and took the risk of being paid out of the property saved. The cargo would have been a total loss but for them, and under all the circumstances it seems to me that a bounty of 20 per cent. of the salved value would be reasonable.

Settle findings on notice stating expenses, etc., in as great detail as counsel deem advisable.